UNDERFEED STOKER CO. OF AMERICA v. AMERICAN SHIP WINDLASS CO. et al.

(Circuit Court, D. Rhode Island. October 3, 1908.)

No. 2,669.

1. ATTORNEY AND CLIENT (§ 72*)—AUTHORITY—APPEARANCE—EVIDENCE—PRESUMPTION OF AUTHORITY.

Ordinarily a record showing the appearance of a defendant by an attorney at law constitutes prima facie evidence of the authority of the attorney.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 102–105; Dec. Dig. § 72.*]

2. JUDICIAL SALES (§ 47*)—JURISDICTION OF COURT—FOREIGN CORPORATION.

The acquiescence of a corporation during a number of years in a sale of property of the corporation by order of a court in another state, made after notice to its stockholders, including four out of its five directors, in a suit in which appearance had been entered for the corporation, is evidence tending to show that such appearance was authorized, and is sufficient proof of ratification, if original authority was lacking; and the title of the purchaser to the property cannot be questioned by a stranger not in privity with the stockholders or creditors of the corporation.

[Ed. Note.—For other cases, see Judicial Sales, Dec. Dig. § 47.*]

3. JUDICIAL SALES (§ 61*)—PATENTS—CONVEYANCE BY MASTER.

A court having jurisdiction of a corporation defendant by its consent had authority to order a sale of patents owned by the corporation to satisfy a decree against it, and an assignment of the patents so sold is not invalid to convey title because, pursuant to order of the court, it was made by the master, instead of by the officers of the corporation.

[Ed. Note.—For other cases, see Judicial Sales, Cent. Dig. § 120; Dec. Dig. § 61.*]

4. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—UNDERFEED STOKERS.

The Jones patent, No. 470,052, for an underfeed furnace, the principal features of which are a fuel magazine of considerable size below the combustion chamber in which the coal is coked before being fed to the fire, a powerful ram operating horizontally to force fresh fuel into the magazine and that which has been coked to the surface of the fire, and an air supply forced under pressure over the magazine and under and through the burning coal, was not anticipated by anything in the prior art, including the Worthington patent, No. 310,110, but covers an invention of great merit and is entitled to a correspondingly broad construction. Claim 6 and claim 9, the latter of which is limited to an "upwardly expanding" fuel chamber, also held infringed by the device of the Taylor patent, No. 792,862.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

5. PATENTS (§ 328*)—INFRINGEMENT.

The Roe patent, No. 566,871, for improvements on the underfeed stoker of the Jones patent, No. 470,052, consisting of an auxiliary feed mechanism, claim 1, held infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. PATENTS (§ 328*)—ANTICIPATION.
    The Roe patent No. 595,837 for improvements in underfeed stokers, claim 1, is void for anticipation by patent No. 566,871 to the same patentee.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

7. PATENTS (§ 328*)—INFRINGEMENT.
    The Daley patent, No. 644,664, for improvements on the underfeed stoker of the Jones patent, No. 470,052, held infringed.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity.  On final hearing.

Charles A. Brown and Frederick P. Fish, for complainant.
William R. Tillinghast, and Gifford & Bull, for respondents.

BROWN, District Judge.  The bill charges infringement of four patents relating to underfeed stokers:

No. 470,052, issued March 1, 1892, to E. W. Jones, claims 6 and 9;
No. 566,871, issued September 1, 1896, to John M. Roe, claim 1;
No. 595,837, issued December 21, 1897, to John M. Roe, claim 1;
No. 644,664, issued March 6, 1900, to F. A. Daley, claims 1 to 6, inclusive.

The defendant questions the sufficiency of complainant's proof of title to the Jones and Roe patents.  Title to these patents was formerly in the Jogada Furnace Company, a corporation organized under the laws of Oregon.  By stipulation defendant admits that the complainant has acquired title to the patents in suit—

"except so far as the title to said patents, or any of them, is derived under the transfer from Tallmadge Hamilton, as special master for the Jogada Furnace Company, to M. S. Klauber, as to which the defendants require the complainant to produce its proofs, and reserve to themselves the right to make any legal objection they may be advised."

The special master, by order of the United States Circuit Court for the Eastern District of Wisconsin, in a creditors' suit in equity, Benjamin M. Weil v. Jogada Furnace Company, was authorized to sell at public auction the patents and patent rights of the Jogada Furnace Company, with directions to report the sale to the court for confirmation.  It appears that prior to the sale copies of the notice of sale were sent by post to all the stockholders of record.  In the list of stockholders were the names of four out of five of the directors of the Jogada Furnace Company.

The sale having been confirmed by the court, the special master executed an assignment of the various letters patent, including the Jones and Roe patents now in suit.  This assignment was recorded in the Patent Office on May 14, 1900.

The defendant contends that the Wisconsin court was without jurisdiction to authorize this assignment of intangible property, for the reason that the appearance and assent of the Jogada Furnace Company to the appointment of a receiver was not authorized by the corporation.  The defendants urge that there was no jurisdiction of the court sitting in Wisconsin, without a valid consent of the Jogada Furnace Company to be sued there, and that it now appears that the consent was not authorized, but was the act of a committee of management having no such power.

The record in the case of Weil v. Jogada Furnace Company shows an appearance for the Jogada Furnace Company, and an assent to the appointment of a receiver according to the prayer of the bill, by Philip S. Abbott, its attorney.

In the deposition of Fred A. Daley appears the following:

"The management of the company, whose authority was based upon a resolution passed by the board of directors at their regular annual meeting February 13, 1895, appointed Philip S. Abbott as solicitor for the company, with authority to assent to the appointment of a receiver as prayed for by the creditors," etc.

The resolution of the board of directors referred to is in the record. This resolution contains very broad language authorizing three agents of the company, one of whom was a director, to —

"do all and every matter and thing which it is within the power of this board to lawfully confer upon them the right to do in the conduct of business for and on behalf of this company; it being intended to confer upon them the amplest powers possible."

The complainant contends that by the terms of the resolution this authority is limited to the conduct of business in a specific territory. The proper interpretation of the resolution is somewhat doubtful, since the circumstances which might aid in interpretation are not in evidence. Conceding, however, for the purposes of the case, that it should be so limited, it does not follow of necessity that the Circuit Court of the Eastern District of Wisconsin was without jurisdiction. Ordinarily a record showing the appearance of an attorney at law constitutes prima facie evidence of the authority of the attorney. Osborn v. United States Bank, 9 Wheat. 830, 6 L. Ed. 204; Hill v. Mendenhall, 21 Wall. 453, 22 L. Ed. 616; Ritchie v. McMullen, 159 U. S. 235–241, 16 Sup. Ct. 171, 40 L. Ed. 133.

It was not necessary to the complainant's case to offer any other evidence of the consent of the Jogada Furnace Company to the jurisdiction of the court than evidence afforded by the record. Strictly speaking the testimony of Daley that the attorney was authorized by particular agents does not negative other authority. The long-continued acquiescence of the corporation in a sale which was made after notice to all of the stockholders, including four out of five of the directors of the corporation, is evidence tending to show original authority, and is sufficient proof of ratification, if original authority was lacking.

The assumption is justified that notice to four out of five of the governing body of the company must have resulted in notice to the company itself (see Lumbermen's Insurance Company v. Meyer, 197 U. S. 407–418, 25 Sup. Ct. 483, 49 L. Ed. 810), and that a sale and assignment made after such notice was in conformity with the interests of the stockholders and of the corporation. If neither the creditors of the corporation, its stockholders, nor its directors have seen fit to question the validity of the decree of the Wisconsin court, this court should make every presumption in favor of the regularity of the decree.

In raising this objection to complainant's title the defendant is in no privity with creditors, stockholders, or directors of the Jogada Furnace Company. The court, having acquired jurisdiction by consent

of the corporation, had authority to subject the patent rights to the payment of judgment debts (Ager v. Murray, 105 U. S. 126, 26 L. Ed. 942), and to order the execution of an assignment. The decree in the Wisconsin case omitted to direct the Jogada Furnace Company to make the assignment, but directed the master to execute and deliver to the purchaser a good and sufficient deed of conveyance. This omission is formal, and insufficient to constitute a substantial defect in the complainant's title. It was clearly within the chancery powers of the court to compel an assignment, even against the will of the defendant, and a deed of assignment executed by the master of a court having jurisdiction would have in every other jurisdiction the same force as a deed executed by the officials of the corporation. The Wisconsin court having made an order that the assignment of the patents should be made by a special master, it might be assumed, were it necessary, that the proper conditions for the exercise of that power were shown to the court before the entry of the decree. There seems to be no substantial reason why the decree should be regarded as invalid because it does not in terms provide for the execution of the deed by officers of the corporation, when such execution would be merely in obedience to the decree of a court, not involving any voluntary choice of the corporation.

### The Jones Patent.

The complainant's fundamental patent is the Jones patent No. 470,-052. The other patents are for improvements upon a special type of furnace described in that patent. The patentee says:

"My invention consists in a novel construction, combination, and arrangement of means in furnaces in which the fuel is forced into the mass of burning coals from a point below said mass, instead of being discharged on top of said mass of burning fuel, said means serving to force the supply of air directly over the fresh or green fuel and at the same time under the mass of burning coal, thereby causing the gases from the green fuel and the air supplied to become thoroughly mixed before they pass through the burning fuel and off into the flue or flues, said means also serving to regulate this supply of air, and thus insure complete combustion, said means also serving to prevent inconvenience from the formation of clinkers and avoid the waste of fine coal," etc.

Claim 6 is as follows:

"A furnace provided with a fuel chamber or magazine, and provided with perforated pipes or tuyeres connected with a pipe of an air-supplying apparatus whereby air is forced under pressure directly over said fuel chamber and under and through the burning coal, and with a device for forcing the fresh coal up into the fire, substantially as described."

The proof of the great practical and commercial value of the combination described in this claim is very clear. The type of furnace covered by the claim has, in fact, played a most important part, if not the chief part, in the improvement of what may be termed the art of underfeed stoking, and in securing the complete and smokeless combustion of bituminous coal.

It is conceded by the complainant that the scientific principles upon which a proper combustion of bituminous coal might be obtained were well known. The prior patent to Worthington, No. 310,110, December 30, 1884, refers to a former practice in hand firing, of depositing

coal at the side or in front of the fire, and thus permitting the hydrocarbon gases to distill, or partially distill, from it before spreading it over the fire. Various devices of the prior art show a knowledge of the desirability of distilling the hydrocarbon gases from bituminous coal and thoroughly consuming them, as well as the fixed carbon. By the distillation of the hydrocarbons coal is converted into coke, and smokeless combustion of bituminous coal is obtained by distilling and burning the volatile hydrocarbons and then burning the fixed carbons in the form of coke.

The Jones patent is the first in the art to show a structure well adapted to handle large quantities of coal, to secure its most perfect combustion, and to provide for the efficient application of its heat to the requirements of modern boiler practice. After a careful consideration of the case I am of the opinion that it should be regarded as a primary patent of great merit.

Jones provided a fuel magazine of considerable size and of a design capable of adaptation to any length or size of furnace required. His means of feeding was a powerful ram thrusting coal horizontally into one end of a fuel chamber or magazine, and at each stroke of the plunger forcing the coal previously fed up towards the fire; the ram being of a character well adapted to move large quantities of coal against resistance, and to co-operate with a fuel magazine of considerable dimensions and of oblong shape. His fuel magazine or chamber, when filled with coal, served as a support for a large mass of burning fuel above it; a large part of the burning fuel not being grate-supported, but supported by the underlying mass of green fuel.

Although Jones shows side grates, he distinctly states that they are not depended upon for the supply of air to carry on combustion, and therefore the ashes and other débris may be allowed to pile over them to any reasonable depth. The fuel chamber is closed save at the top, and the sole air supply is forced under pressure directly over the fuel chamber and under and through the burning coal. Nothing in the prior art anticipates the Jones invention in this feature; that is, the introduction of the entire air supply under pressure at the top of the fuel chamber.

The Jones structure is well adapted to be made in large sizes and to handle and consume large quantities of coal, an important consideration, since it was thus enabled to supply a practical demand for a furnace adequate to the increased boiler surface demanded by modern development and practice. The capability of increase in size is not to be regarded merely from the mechanical standpoint. The proof is strong that with increased size results a more efficient and practical application of the scientific principles of combustion. The term "magazine," in the claim, as applied to a coal receptacle, seems to be an appropriate expression for a receptacle designed to hold a considerable body of fuel for a considerable time before it is brought to the surface to be burned.

The magazine of Jones is an efficient coking chamber. Its size provides for the retention of the coal for the proper period for coking. The exclusion of air from the magazine while the mass of green coal is subjected to the intense heat from the superincumbent mass of burn-

ing coals gives most favorable conditions for completely extracting all the hydrocarbons and reducing the coal to coke before it is supplied with air for combustion.

The size and power of the feeding means contemplated by Jones have relation to another feature of combustion. Upon the formation of coke the fuel expands into a spongy mass, which would have a tendency to retard the feeding of coal, were it not driven up with such power as to break up the mass of coke and distribute it properly in the zone of combustion. While the prior art shows many attempts to construct an underfeed stoker, and while it contains evidence of the knowledge of the scientific principles involved in the smokeless consumption of coal, there is but one device of the prior art which deserves special consideration. The only one of the prior devices which contains an approximation to Jones' feature of an air supply at the top of the fuel chamber is that described in the patent to Worthington above referred to. Worthington's purpose was to produce—

"an automatically-feeding, smokeless furnace, preferably adapted to the use, without direct loss, of bituminous coals of varying grades of fineness, said furnace being arranged to so distribute said coals that combustion may be uniform in its progress and intensity, and that the principal heat-producing elements of the coal, viz., the hydrocarbons and fixed carbons, may be so treated therein that the combustion of one may assist that of the other, each receiving the required proportion of oxygen at the proper time and in the proper place to support combustion."

Worthington provided mechanism for—

"feeding coal from beneath the grate into a bowl-shaped receptacle situated at or near the center of the grate, which is preferably round, and the bars of which radiate from the periphery of said bowl."

The coal is fed upwards by means of an Archimedean screw conveyer, which Worthington says he prefers to place at an angle of about 45° from the plane of the horizon. The Worthington specification says:

"* * * The top or periphery of the bowl is provided with slots or openings, preferably made in a radial form, which communicate with a chamber underneath the bowl, into which a volume of air is forced, either by means of the blower or a jet of steam. Said slots are so constructed as to direct the jets of air, or air and steam, therefrom into and through the fresh coal at the earliest stage of combustion, in order to drive out the hydrocarbon and other volatile gases and reduce it to coke as rapidly as it is forced up into the furnace and before it begins to spread out on the grate bars, and to thus maintain the incandescence of the fire at the point on the surface from which the hydrogen gases must escape, thereby reducing them to a thorough state of combustion as they leave the surface."

Elsewhere the operation of his furnace is described:

"The hopper, G, being supplied with coal of a sufficient degree of fineness to pass readily through the pipe, F, the same is carried upward by said conveyer, filling the bowl, D, which soon overflows, when the coals are deposited upon the grate, the bars, e, of which are preferably slanted downward as shown, until the whole mass is formed in a kind of oval or dome shape, the greatest depth being above the bowl. The jet of steam from the pipe, k, forces a hot-air blast into the chamber, I, the shape of which, in conjunction with the funnel-shaped orifice, i, tends more or less to compress the air and steam in said chamber, from which it issues with great force through openings, d, thereby being generally distributed through the fresh coal at the earliest

stages of combustion or distillation. A sufficient amount of oxygen is thus brought into contact with the fresh fuel to unite with and wholly consume the hydrocarbon gases first given off, and I aim thereby to produce a sufficient heat to decompose the superheated steam and by adding its hydrogen to that simultaneously evolved from the coal a flame of the utmost intensity is produced at the outset, and the coals passing up from the bowl, D, are rendered incandescent before reaching the top or surface of the fire, at or near which point the second stage of combustion, viz., that of the fixed carbons, commences, the arch, L, in the meantime serving to accumulate the heat and reflect the same back upon the mass of coals, which are thus uniformly retained in their incandescent state."

Elsewhere he says of the coal:

"As the same will have reached an incandescent state before passing over the edge of the bowl onto the grate bars."

Upon a fair construction of the Worthington patent it must be held that Worthington was familiar with the scientific principles of combustion, and that he intended to coke his coal in his bowl-shaped receptacle before it was spread out on the grate bars, and to use a top supply of air under pressure to assist in coking the coal. It is quite evident, however, that Worthington did not rely solely upon the air supply at the top of the bowl for combustion. He says:

"Openings above the grate in the usual way admit air which, with that ordinarily passing through the grate, serves to complete the combustion of the coke by combining with the carbonic oxide that might otherwise escape and converting it into carbonic acid."

The drawings, moreover, show this.

Comparing the Jones and Worthington devices, important differences will be noticed. The fuel magazine of Jones is a receptacle of substantial size, well adapted to serve as a coking chamber, and to contain a considerable body of coal, covered for a considerable time by a hot fire, which raises the temperature of the coal gradually so as to distil the hydrocarbon gases. Worthington's fuel-receiving bowl is of small size, and not a "magazine" in the sense of the term as used by Jones, adapted to a slow coking process. Jones' air supply is forced under pressure directly over the fuel chamber and under and through the burning coal. So far as can be judged from the Worthington patent, it was intended to direct a blast of air through all the coal in the bowl, as well as through a dome-shaped mass of coal which rests partially upon the grate and partially upon the bowl-shaped receptacle.

The burden is upon the defendant to anticipate the Jones patent by clear evidence, and any ambiguity or indefiniteness in the Worthington patent must, of course, be taken against the defendant.

The third feature for comparison is the device for forcing the fresh coal up into the fire. Jones uses a powerful ram, well adapted to co-operate with enlarged coal receptacles or magazines, and which both feeds and raises the coal to the surface by a horizontal and endwise thrust, while Worthington's Archimedean screw, placed underneath at an angle of 45°, necessarily serves as a limitation upon the size, and shows that he did not have Jones' conception that the coal could be both fed and raised by a horizontal thrust. There is no evidence to show that the Worthington device was ever constructed for commer-

cial purposes, or that it ever had any effect upon the practical art.

While, as we have said, the Worthington patent discloses a knowledge of the principles involved in the complete combustion of coal, it fails to show that Worthington appreciated the advantages of Jones' method of reducing fresh coal to coke by excluding air from a coking chamber during practically all the process of distillation of the hydrocarbons. He says concerning the slots in his bowl:

"Said slots are so constructed as to direct the jets of air, or air and st  n, therefrom into and through the fresh coal at the earliest stage of combustion, in order to drive out the hydrocarbons and other volatile gases and reduce it to coke as rapidly as it is forced up into the furnace."

Again he says, of his compressed air supply, that it—

"issues with great force through the openings, thereby being generally distributed through the fresh coal at the earliest stages of combustion or distillation."

In claim 5 of the Worthington patent this idea is expressed as follows:

"And means, substantially as described, for injecting a blast of air, or air and steam, into said fresh coal at or near the periphery of said bowl, whereby the volatile gases may be liberated and consumed and the coal coked before spreading upon the grate bars," etc.

It seems to be a fair construction of the Worthington patent to say that Worthington intended to introduce compressed air while the coal was still in process of distillation, and at an early stage of distillation, to aid in coking the coal.

The Worthington patent contains suggestions as to an increase of size.

"It is clearly apparent that, when a large grate surface is required, two or more conveyers placed side by side with corresponding receptacles may be used, either with a like number of revolving grates or a stationary grate, in which latter case, instead of two or more circular receptacles, a single oblong trough may be used, with which several conveyers may connect."

This is insufficient to show a conception that by an increase of the size of his receptacle he could obtain a more efficient distillation of the underlying mass of coal.

In connection with the small size of the bowl of the Worthington patent it should be observed that in his specification he remarks:

"It is uniformly admitted by many furnace builders and users that to obtain the best results from coal as a fuel it should be supplied in small charges, or, better still, fed into the furnace continuously in quantities or at a rate corresponding to the rate of combustion."

It is apparent from the mechanical structure of Worthington that he was concerned with supplying small charges of coal. His furnace was a grate furnace, and the air supply in his bowl was designed to co-operate with the ordinary draft through the grates and through the door of the furnace.

Evidence has been introduced upon both sides as to experiments with a stoker made in accordance with the Worthington patent. The defendant's evidence seems to show the possibility of the smokeless consumption of coal by the Worthington device. Giving due weight

to the evidence as to the experiments, I am of the opinion that the Worthington patent does not clearly show the same mode of operation in respect to the combustion of coal as is inherent in the structure of the Jones patent. The slow distillation of all the gases in the large fuel chamber, and the reduction of the coal to coke before it is subjected to the action of air, the air supply solely at the top and not aided by the ordinary draft through grates or doors, is substantially different from the Worthington operation of distilling the gases from a small quantity of coal in a small receptacle and supplying air under pressure, during the early stages of distillation, to assist in distillation, while also supplying air through grates and doors in the ordinary way to aid combustion.

But it is not necessary to the complainant's case to find a difference from Worthington's method of burning coal, since the structural features of the Jones device are so distinctly superior as to make it patentable over Worthington in respect to features new with Jones and which are embodied in the defendant's stoker. The horizontal feed by a ram into one end of the elongated retort with the air supply at the sides, and the raising of the coal to the surface of the fire by the horizontal thrust of the ram, removes the limitation as to size inherent in Worthington's device, and makes a structure which can be conveniently and practically located with relation to the boilers with which it is designed to co-operate. The photographs in evidence of plants in actual operation show clearly the practicability of the Jones' construction and the impracticability of the Worthington construction.

Worthington suggests the possibility of enlargement by duplication of conveyers and grates, or by using a single oblong trough with which several conveyers may connect. He does not show, however, how to apply his oblong trough with several conveyers, and his suggestion of a way of increasing the capacity of his stoker emphasizes the inventive character of the changes made by Jones, and of a horizontal endwise feed lifting the coal to the surface of a retort which is capable of indefinite extension in size according to the demands of practice without rendering the top surface of the coal in the retort less accessible to the air supply.

The difference in size is a material difference. The Jones structure is capable of growth and of adaptation to practical needs by mere enlargement of parts. The Worthington structure is incapable of enlargement without entire reconstruction.

In this connection should be noticed the language of Justice Burbridge in the Exchequer Court of Canada, quoted in the record:

"By adopting an oblong, or bathtub-shaped, fuel chamber, Jones succeeded in producing a mechanical stoker in which the requisite area of fire was obtained, and at the same time every part of the fuel within the zone of combustion was within reach of, and in effective contact with, the air supply of the furnace."

I am of the opinion that the sixth claim of the Jones patent is for an invention of great merit, that it is entitled to a breadth of construction commensurate with its merit, and that it is not so limited by any disclosures of the prior art, including those of Worthington, that the defendants can escape infringement.

Claim 9 is as follows:

"A furnace provided with an upwardly-expanding chamber, closed at bottom and sides, having connection with an air-supplying apparatus at or near its top whereby the fresh or green fuel is confined while air is being forced first over the top of the fresh fuel below the mass of burning fuel and through the burning fuel, in combination with a device for forcing fresh fuel up into the burning fuel, substantially as described."

The fuel magazine described in this claim has an upwardly-expanding chamber and is thus described in the specification:

"Said magazine being provided with an upwardly-curved bottom, B¹, upwardly-flared, closed sides, B², and an inwardly and upwardly extending hood, or overhanging top portion, B³."

It is also said:

"The bottom of the fuel magazine can be of iron or brick, and it can be curved on a slight incline or the incline may be straight, and of any angle suitable for insuring the free gliding up of the fresh fuel which is being forced in by the ram."

Apparently this upwardly-expanding chamber was designed to relieve friction, and to assist the passage of coal from the bottom to the top of the chamber. The chamber or magazine of the defendant, which lies beneath the tuyeres, or air supply, does not have expanding walls. Nevertheless there is an expansion at the top of the defendant's structure which permits the expansion of the coke under heat as it approaches the surface. The similarity between the complainant's and the defendant's structures in respect to an expansible chamber, if any, is in this feature, which permits expansion of the coke near the surface.

Complainant contends that defendant has an upwardly-expanding chamber at the point where the upwardly-expanding chamber is required, in order to take care of the expanding coke. I confess to some doubt upon the question of infringement of this claim. Nevertheless, claim 9 is for a combination containing a limitation which distinguishes it from claim 6. Although the defendant does not infringe, unless brought within this limitation as to the character of the chamber, as well as within the general combination, yet he cannot escape infringement by so varying his structure as to avoid the use of some of the advantages of the upwardly-expanding chamber, provided he still uses any of its advantages. Conceding that the chief advantage, and perhaps the only contemplated advantage, of this upward expansion, was to assist the raising of the coal by the ram, the structure nevertheless did involve an advantage at the period of the expansion of the coke under heat, and the defendant doubtless has this feature. This claim must be considered, not as a claim for an upwardly-expanding chamber, but as a combination claim, which differs from claim 6 only in the specific character of one of the elements. I am of the opinion that this claim is infringed, for the reason already given to show infringement of claim 6, with the additional reason that a specific feature of the more limited claim is also employed.

The defendant contends that this claim can be distinguished from the Worthington patent only by the word "expanding"; but this is

too narrow a view, and is met by what we have said concerning the Worthington patent as an anticipation of claim 6. The contention that this claim does not contain patentable subject-matter in view of Worthington is met by our conclusion that the Jones combination is substantially distinct from that of Worthington. I do not find, upon an examination of the file wrapper of the Jones patent, that it affords any sound basis for the defendant's contention that Jones was content to accept claims closely limited to specific details.

### The First Roe Patent.

The first Roe patent, No. 566,871, granted September 1, 1896, relates primarily to improvements upon the Jones underfeed stoker. It is said:

"Owing to the considerable length of said fire box and to the fact that the fuel is delivered thereto by being forced through an admission opening located at the extreme front end of the fire box, it is found in practice that the resistance offered to the passage of the fuel along said retort, due principally to the friction between the fuel and the retort and to the weight of the fuel, is so great that almost the entire bulk of said fuel is discharged into the fire box at the extreme front end thereof, very greatly decreasing the fire area and leaving a large portion of the grate surface exposed, and also causing clinkers to form at the back end of said retort, which, increasing gradually in size, finally necessitate that the fires be drawn in order to clean out said retort. These undesirable features are further increased by the fact that as commonly constructed the bottom of the retort inclines upwardly from the admission opening," etc.

To remedy said defects Roe provided feed mechanism auxiliary to the feed ram, consisting of a rod, located at the bottom of the retort, with projections adapted to engage the coal and push it throughout the entire length of the retort. Claim 1 is as follows:

"In a mechanical stoker, the combination with a retort and a primary feed mechanism, of an auxiliary feed mechanism located in said retort, and a connection between said primary and auxiliary feed mechanisms, substantially as described."

Increased size of the retort having been shown to result in more effective coking and more effective combustion of the coal, it is fair to say that Roe, by supplementing the heavy ram of Jones with the pusher-rod, took an important step in the making of mechanism which would carry out more perfectly than the mechanism of Jones the fundamental ideas to which are due the large and efficient coal consumption of the complainant's underfeed stoker. Roe was engaged with the problem of enlarging the capacity of the Jones furnace. His perception of the desirability of doing this seems to involve a knowledge of the superior efficiency of the Jones type of retort, and of the principles of combustion and the mechanical principles to which this superiority is due. The defendants contend that this claim should be limited to a specific kind of auxiliary feed mechanism, namely, a rod extending longitudinally of the retort. It is conceded that this construction is novel; but the defendant contends that, if the claim be given a broader construction, no invention is involved, in view of the prior patents to Hall and Muller.

The Hall English patent, of July, 1868, related to feeding furnaces

with fuel by mechanical appliances. It shows a series of descending steps upon which the coal falls from a top coal supply, from which steps it is pushed by successive pushers with which each step is provided. The specification says:

"When charging or feeding the furnace the pushers are drawn back and the coal or other fuel in the hopper falls upon the upper plate or block, and is thence pushed off from block to block, or from step to step, in succession or simultaneously (falling partially upon and partially behind the clear fire next below), the smoke or other crude products of combustion having thus to pass over or through the clear fire or incandescent heat, and are more perfectly consumed or intensely rarefied, and thus increase the heating power of the fuel or furnace."

The Muller patent, of January, 1894, shows a similar steplike arrangement, with plungers. In the Muller patent it is said in the specification:

"In the grate shown in Figure 3, which is especially adapted for use with fuels that smoke badly, the fresh or green fuel is pushed underneath the heated mass of fuel and the gases arising therefrom are compelled to pass through this heated mass, which results in complete combustion of the gases and in the prevention of smoke."

The series of pushers in the Hall and Muller patents are designed merely to push off coal from successive steps; the push aiding the force of gravity to carry the coal down. None of them contemplates a forcible action against the resistance of a compacted body of coal in a large retort, and neither of these patentees was concerned with the problem of carrying coal throughout the entire length of a long retort against a strong resistance. It is quite obvious that the screw devices of the Smith patent, No. 199,000, and the English patent to Erskine, No. 3,877, have no relevancy. To contend that each flight of a screw within the retort is an independent and auxiliary feed mechanism is an oversubtlety of argument.

The question of infringement of this claim requires reference to specific features of the defendant's device. The defendant's stoker is shown and described in letters patent to E. E. Taylor, No. 792,862, issued June 20, 1905. In this structure is shown the large and elongated fuel magazine which is characteristic of the Jones patent. In this device the top of the retort or fuel magazine is not horizontal, but inclined, and the primary plunger is located, not at the bottom of the retort, but near the top. Connected with this primary plunger is a secondary plunger, located at the bottom. The incline enables Taylor to avail himself to some extent of a gravity feed. Nevertheless, the coal is brought to the surface of the fire by the horizontal thrust of a ram, aided by the horizontal thrust of an auxiliary ram, though at a different level. The result attained is the underfeeding of the coal throughout the entire length of an elongated magazine, by means which are the mechanical equivalent of those shown in the combination of the Roe patent.

The defendant contends that the adoption of the gravity feed principle, which in itself partially solves the problem of moving the fuel downward and rearward, distinguishes its device from that of the Roe patent. I am of the opinion, however, that the variation which

admits some use of the gravity feed principle is insufficient to avoid infringement. Although the gravity feed is used to some extent, it is used in addition to substantially the same mode of feeding employed by Roe, namely, the end feed by the primary ram, for the first supply of coal, and the auxiliary feed mechanism thrusting the coal first supplied forward toward the extremity of the fuel chamber. The auxiliary feed mechanism of the defendant is the same in function and permits the same enlargement of the fuel chamber as was achieved by the invention of the Roe patent. I am of the opinion that the defendants infringe this claim.

## The Second Roe Patent.

In the second Roe patent, No. 595,837, the first claim is as follows:

"In a mechanical stoker, the combination of a retort or fuel magazine, provided with twyers adjacent to its upper inner edges, means to supply air to said twyers, a primary feed mechanism and an auxiliary feed mechanism, substantially as described."

I am of the opinion that this claim is substantially for the same invention covered by the earlier Roe patent, and is therefore void. It was conceded upon argument that there is one invention stated in two different forms in the first claim of each patent. Having protection under the first patent for this device, to support the second patent also would unlawfully prolong the complainant's patent right.

## The Daley Patent.

The Daley patent, No. 644,664, is dated March 6, 1900. Like Roe, Daley was an improver upon the specific type of stoker covered by the Jones patent in suit. Daley states that the object of his invention is:

"First, the provision of improved means for conveying air under pressure to the twyer openings, whereby the expensive twyer-boxes heretofore employed for this purpose may be dispensed with, and second in so constructing furnaces employing dead plates that the dead plates may be cooled by the incoming air under pressure before the air is directed upon the burning fuel, so that the life of the dead plates may be greatly increased; and it is in connection with furnaces employing dead plates that my invention has its greatest utility."

Six claims of the Daley patent are in suit. It will be sufficient to consider the second:

"In a furnace, an imperforate fuel-bearing surface, and a retort dividing the furnace into a fire box and an air chamber, the retort being provided with twyer openings or passages for establishing communication between the air chamber and the fire box, and means for conveying air under pressure to the air chamber, substantially as described."

Daley substituted, for the open grates at the sides of the Jones furnace, closed plates; removed the tuyere boxes, or rather removed the bottoms of the tuyere boxes, so that the space beneath the grates of Jones, which served as an ash pit, was converted into an air chamber. The result of this was that all portions of the furnace subjected to heat were also subjected to the cooling of the air under pressure, thereby extracting the heat from the metal and thereby warming the air before it was forced through the tuyere openings to the fire.

Complainant in argument fairly described the Daley improvement as follows:

"The furnace is divided into two parts, one of which is for air and the other of which is for the burning fuel. When the air is let in it does one thing with two results: First, in passing through the air chamber it extracts the heat from the iron, thereby prolonging the life of the iron; second, by extracting the heat from the iron it becomes itself hotter, and goes into the furnace so heated as not to cool off the fuel, but so that increased combustion and heat result from the operation. The heat taken from the combustion chamber by the iron is taken up by the air and restored to the combustion chamber."

It is said:

"His idea involves an air chamber practically coextensive with the entire fuel-bearing surface, which is filled with compressed air brought into contact with practically all the heated iron; * * * that is, Daley delivers every particle of air that is used in his machine up against all the heated portion of the machine. That is his invention; that, his idea."

In the defendant's device, as described in the patent to Taylor, No. 792,862, there is shown a division of the furnace into a combustion chamber and an air chamber, which substantially corresponds with the arrangement described in the Daley patent. In the Taylor patent it is said:

"Air is fed through a pipe, 43, to an air trunk, 44, extending across the furnace beneath the retorts, and communicating with the air boxes, 45, between the retorts."

At each side of the retort of Taylor is an air chamber, and underneath the retort is also an "air trunk," as Daley calls it, communicating with the air boxes at the side. The defendants deny infringement of the claims of the Daley patent, contending that dead plates are an essential element of the claims of the Daley patent, and that they are not used by the defendants for the purpose of dividing the furnace into air chamber and combustion chamber.

Defendant contends that, as a consequence of the employment of a gravity feed, he locates his dead plates at the bottom of his inclined retort, where they simply serve the function of dumping grates. The term "dead plates," however, is not used in all the claims of the Daley patent. The element is described in the various claims as "dead plates," "an imperforate fuel-bearing surface," "fuel-supporting means," and "fuel-bearing plates."

In the defendant's furnace the retorts are arranged in pairs, which are divided by a portion of the air chamber. At the top of the air chamber there are tuyere blocks of a triangular shape, arranged on an incline from the top to the bottom of the retorts. Each of these tuyere boxes has a chamber in its apex, provided for the purpose of admitting cool air to the point of the tuyere to prevent its being burned off, as is stated in the specification of the Taylor patent. The specification also states:

"By constructing the twyer-blocks with the shape hereinbefore described the fuel is permitted to spread out from each of the retorts and come in contact with that fed through the other retorts to form a single wide bed of fuel extending across the whole extent of the furnace."

The tops of the tuyere boxes support to some extent the fuel, and, like the dead plates of Jones, are cooled by the admission of air to the air chamber. I am of the opinion that there is the adoption by the defendant of the same general division of the furnace into the combustion chamber and air chamber for the same purpose for which Daley adopted it.

The defendants contend that giving to the claims of the Daley patent a construction broad enough to cover defendant's device, they are anticipated by the Jones patent in suit, by Brown's patent, 57,987, the Shinners patent, 552,335, figure 1 of the Worthington patent, and figure 4 of the Roe patent in suit.

The contention as to the Worthington patent requires careful consideration. The fire bowl or receptacle of this device is surrounded by a large air chamber, into which is forced compressed air, which escapes through perforations at the top of the bowl; and Worthington describes this arrangement as designed to permit the air to become thoroughly heated before its introduction into the combustion chamber. Undoubtedly the heat would be extracted from the iron and the iron preserved; and the bowl, whose perforated top constitutes the tuyeres, would be preserved from the heat, as in the Daley and the Taylor structures. As has been said in relation to the Worthington patent, the Worthington forced draft was designed to co-operate with the ordinary draft, and his bowl to occupy a central portion of a very considerable amount of grate surface. Although we can find in the Worthington patent a surrounding chamber filled with air under pressure which serves to cool the tuyere blocks and the fire bowl, I do not think that claim 2 of the Daley patent can be read upon the Worthington device; for if the periphery of Worthington's bowl above his tuyere openings should be regarded as an imperforate fuel-bearing device, yet it does not, with the retort, divide the furnace simply into a fire box and an air chamber, as in the Daley patent and in the Taylor patent. While all the air supplied by Worthington under pressure would cool the bowl and be heated, the air supply from natural draft would pass above the fire and through the grate bars. Daley's conception of the complete division into air chamber and combustion chamber, and the direction of his entire supply of air against the heated parts of the furnace, is not anticipated by Worthington.

Reference is made to the file wrapper and to various discussions in the Patent Office; but upon a careful reading of this file wrapper I find no concession made by Daley which precludes him from contending that the substance of his invention is to be found in the Taylor device, and that the variations are not substantial.

Concerning the Taylor patent it may be said that it contains features of a novel character, that it makes some use of the gravity feed principle, and that in the prior art may be found various structures which more or less resemble the device of the Taylor patent, and which do not resemble the Jones device.

I am of the opinion, however, that in designing the Taylor device the patentee has followed closely the fundamental principles of the Jones patent, the Roe patent, and the Daley patent, and that the chief

merit of his structure is in its adoption of these features, rather than in its adoption of inclined fire boxes.

The decree will be for the complainant, for infringement of claims 6 and 9 of the Jones patent, claim 1 of the first Roe patent, and all claims of the Daley patent. Claim 1 of the second Roe patent is held void, in view of the first Roe patent.

A draft decree may be presented accordingly.