UNDERFEED STOKER CO. OF AMERICA v. RILEY et al.

(District Court, D. Massachusetts. May 22, 1914.)

No. 459.

PATENTS (§ 328*).—VALIDITY AND INFRINGEMENT—FURNACE.

The Daley patent, No. 644,664, for an underfeed furnace, discloses patentable improvements over the furnaces of the prior patents to Jones & Garden, and is valid; also *held* infringed.

In Equity. Suit by the Underfeed Stoker Company of America against R. Sanford Riley and others. On final hearing. Decree for complainant.

See, also, 207 Fed. 963.

Fish, Richardson, Herrick & Neave, F. P. Fish, and J. L. Stackpole, all of Boston, Mass., for plaintiff.

Louis W. Southgate, of Worcester, Mass., for defendants.

BROWN, District Judge. This is a bill in equity, alleging infringement of letters patent No. 644,664, March 6, 1900, on application of March 23, 1896, to Fred A. Daley, for furnace.

This patent was in litigation in Underfeed Stoker Co. of America v. American Ship Windlass Co. (C. C.) 165 Fed. 65, 77. It was considered also in American Stoker Co. v. Underfeed Stoker Co. of America (C. C.) 182 Fed. 642, 652, and on appeal 188 Fed. 314. The opinion of this court on petition for preliminary injunction in the present case is reported in 207 Fed. 963.

In view of the full descriptions of the Daley invention contained in these opinions, it seems unnecessary to repeat at length. The patent relates to improvements by Daley upon the type of underfeed stoker shown in the patent to Jones, No. 470,052, and that to Garden, No. 648,251.

The specific and limited character of Daley's improvements, and the particular purpose for which his modifications of the Jones and Garden stokers were made, should not be lost sight of in considering the matters urged in defense as anticipatory or as limiting the claims. If we consider that Daley's structural improvement upon Garden consisted simply in substituting for Garden's air ducts, which led compressed air to the top of the retort, a large air chamber, which also performed this function, and thus was an efficient substitute for Garden's air ducts, we must also consider that in so doing his air chamber performed two functions additional to those of Garden's air ducts: First, to cool and thus preserve the life of Garden's side plates; second, to heat the air so that it was introduced into the retort at a higher temperature. We have, therefore, not a mere substitution of one form of air supply for another form of air supply, but the substitution of a form of air chamber which did all that Garden's air pipes did and also used the air in a different way and for purposes different from those for which it has been used in the prior art.

In considering whether there was anticipation or lack of invention, these things must be kept in mind.

At final hearing the defendants put special stress upon the patents to Dumery, French patent No. 11,867, December 1, 1854, and six certificates of addition, and British patent No. 129 of 1855. Dumery discloses an underfeed stoker wherein at the top of a retort is a series of large inclined grate openings upon which the fuel is to be burned. Below these openings is fed the green fuel, and it was designed to coke the green fuel by the heat at the top of the retort. At the sides of the retort are also longitudinal grates for the burning of fuel. The air for combustion is supplied both under the grates at the top of the retort and under the side grates from an open ash pit below. Dumery suggests the use of a forced draft, if desirable.

The grate openings at the top of the retort are substantially different both in construction and in function from the tuyere openings of the Daley, Jones, and Garden patents. Dumery's grate openings both at the top of the retort and at the sides admit air in the ordinary way in which air is admitted to grates, and are not designed to hold the air under pressure, or to admit it in restricted and definite quantity and

direction  Jones, Garden, and Daley are distinguishable from Dumery in that they all admit the air only to the retort and through tuyere openings  The defendant Riley, as will be seen hereafter, admits air to the retort in precisely the same way as Jones, Garden, and Daley, though Riley has the additional feature, which will be considered when we reach the question of infringement, of admitting air elsewhere than to the retort, and of using the air so admitted for combustion. As the matter of the distinction between grates and tuyeres was discussed in the opinion upon preliminary injunction, it seems sufficient to refer to that opinion without here repeating.

While Dumery's patents are discussed with great minuteness, this discussion does not seem to relate to the specific improvements made by Daley, nor does it seem to add anything to the defense presented upon motion for preliminary injunction in connection with the Howell patent, No. 54,730, which was considered in former litigation.

It may be conceded that it was old in actual practice with overfeed furnaces to use a forced draft under fuel-burning grates, and that with both natural and forced draft the air was admitted under and through the entire grate surface, and had a cooling effect on the grate bars or perforated fuel supports. We may also assume that in the prior patented art are disclosed underfeed furnaces having fuel-burning grates through which air passes from an ash pit or air chamber, by natural or forced draft, into the fire box, and with more or less cooling effect upon these fuel-burning grates; but, so far as appears, any cooling effect was directly associated with and incidental to the admission of air for the purpose of combustion.

Mr. Browne, defendants' expert, says that in utilizing the entire space below the fuel and ash supports for the admission of air blast under pressure, Daley reverted simply to the common practice of the earlier art. He says also that Jones and Thompson (Garden) in this respect—i. e., in introducing the air to the top of the retort through pipes or ducts—were peculiar to themselves. This, however, seems to give substantial support to complainant's contention that Jones and Garden constitute the only real and relevant prior art with respect to the Daley patent.

It was the fact that the air was not admitted in the ordinary way, but was forced into the top of a retort directly over the fresh fuel, and at the same time under the mass of burning coal, that developed new conditions and gave rise to the special defect that Daley remedied.

Both Jones and Garden supplied the air only where it was needed to promote combustion. At this place grates were not supplied to support the burning fuel, since it was supported by the underlying mass of green fuel. Side grates were not required to admit air for combustion, though side supports of some kind were required for the ignited fuel and ash which overflowed the sides of the retort. When Garden substituted for the side dead grates of Jones imperforate dead plates, there was a new kind of division between fire box and the space below the fire box.

The use of air pipes or ducts leading directly to the top of a retort was a departure from old types of furnace which resulted in leaving the

214 F.—51

metal parts, which supported a portion of the contents of the fuel chamber and formed a part of the partition between the fire box and the space below the fire box, without the protection of a supply of live air. With a grate furnace, the air which supports combustion also cools the grate bars, and, as it is supplied for combustion to the whole grate surface, it also has its cooling effect on the whole grate surface.

The burning out of the side supports both in Jones and Garden was due to the presence of heat above and the absence of live air below.

Neither of them, so far as appears, seems to have perceived what Daley perceived and embodied in his patented structure; i. e., that the metal parts, which, unlike a grate, did not serve the function of admitting air for combustion, still needed a supply of air in order to prevent their burning out. Daley's use of a large chamber in order to direct his supply of air under pressure, not only to the retort, but also to a place where it was not needed for combustion, but only for the specific purpose of cooling a metal part which required an air supply for no other purpose than its preservation, in my opinion, is not anticipated by anything in this record.

It is further urged that an air chamber arranged under the fuel-supporting partition, and coextensive therewith, into which air is forced under pressure of a blower, being an old form of air supply, Daley's alleged invention is a mere aggregation of the same with an old under-feed stoker. As to this proposition the defendants rely upon Heald v Rice, 104 U. S. 737, 26 L. Ed. 910, Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241, and Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856.

The defendants' contention as to invention is put in the form of a question:

"Is this court going to sustain broadly a patent for merely putting an old form of air chamber under an old form of fire box?"

The case, however, cannot be stated fairly with such simplicity.

If it can be said that Garden shows a form of fire box which, as to Daley, was old, it cannot be said that Daley shows an old form of air chamber merely because air chambers coextensive with grates were old. This ignores the very material difference between the top portion of the old ash pits, consisting of grates or plates perforated for combustion, and the top of Daley's air chamber, which is imperforate or substantially so to avoid the defects of Jones' dead grates.

Moreover, as we have said, Daley does not make a mere substitution of one form of air supply for another, since his air chamber performs, not only the function of supplying air to the retort for combustion, but also the function of supplying air at a certain place merely for the purpose of cooling and preserving the life of parts which are not provided with air for combustion.

That Daley's improvement was of very substantial importance in the practical art, and prevented a serious defect which was present in both the Jones and Garden structures, namely, the rapid burning out of the metal parts, seems very satisfactorily established by the testimony. Whether there is a practical advantage in the preheating of the air by contact with the hot metal parts, so that it goes into the furnace at a

higher temperature advantageous to combustion, is quite sharply disputed. There is doubtless some rise of temperature. The defendant contends that as a practical advantage it is negligible. I am of the opinion that upon the whole testimony as to this point the preheating of the air is of some advantage for combustion, and that this feature must necessarily be associated with the cooling of the metal parts.

In Underfeed Stoker Co. v. American Ship Windlass Co. (C. C.) 165 Fed. 65, 68, it was conceded by the complainant, as it is now conceded, that the scientific principles applicable to underfeed furnaces for the combustion of bituminous coal were well understood. All that portion of Dumery's patent which relates to these general principles is therefore but a restatement in other form of matters that were formerly before the courts. It has not been made to appear that any device embodying these principles was, before Jones or Garden, developed to such a point as even to suggest the specific problem with which Daley had to deal, and which he solved by means not obvious to Jones or Garden.

After careful consideration of the defendants' argument on the question of validity of the patent, I am of the opinion that the patent is valid.

Considering the question of infringement: It is an essential feature of Daley's invention that the side plates be sufficiently imperforate to maintain the air under pressure, and they should form so effective a roof for the air chamber that the air therein is held under pressure, so as to extract the heat from the retorts and side plates, cooling the side plates, and heating the air before its injection into the fuel chamber.

Upon the petition for preliminary injunction it was contended that, if the side plates permitted the escape of a substantial amount of air, the device was not within the Daley patent. This view was then held erroneous, and is now considered erroneous, for the reason that, if the defendants' air chamber performs the functions of Daley's air chamber, the fact that it also permits the escape of air through the fuel supports would not avoid infringement, since, even if there were some utility in permitting the escape through the fuel supports, this would be regarded merely as an improvement, and would not justify the defendants in using a structure which, despite the openings, was substantially Daley's air chamber.

Upon the present hearing the question of infringement is presented in a somewhat different aspect. The defendants now contend that there is no construction in the Riley stoker depending upon the use of restricted openings to maintain a pressure in the air chamber, that the whole structure is intended to get as much air as possible vertically through Riley's so-called grates, and that the only restriction to the passage is the fuel bed itself.

Upon a consideration of the model and of the drawings, as well as the entire testimony in the case, I am of the opinion that this contention is not supported by the evidence.

The defendants insist that the Riley side fuel supports are grates, and that Riley's structure resembles the grates of Howell and of Dumery, rather than the side plates of Daley.

In the continued use of the term "grates" the defendants' counsel and experts beg a question which is before the court for decision. The upper edges of the retort carry overlapping blocks, which are similar to the Taylor tuyere blocks, which, in Underfeed Stoker Co. of America v. American Ship Windlass Co. (C. C.) 165 Fed. 65, 77, were found to be equivalents for the fuel-supporting means of the Daley patent. They perform the function of admitting air to the retort precisely as the openings in the Daley patent perform this function. These blocks are overlapping, and are ridged so that upon the upper surface they present the appearance of grates; but air is not supplied vertically from below as through grates, since that part of the blocks underlying these ridges is imperforate. The air is blown through openings of limited size at the ends of the blocks, so that there is a very slight resemblance between the apertures for admitting air between these ridges and grate openings admitting air vertically. As the bottoms of the so-called grate blocks are substantially imperforate, and the area of a cross-section of the openings which admit air at the end of these grate blocks is very small in proportion to the area of the grate blocks, the use of the term "grates" is misleading, since it ignores the fact that the place where air is ordinarily admitted to a grate is blocked up and the metal bottoms of the blocks which close the space below the ridges afford an imperforate roof underneath the ridges called grate bars. It is more correct to call these blocks tuyere blocks, with side openings into the retort and end openings at the sides of the retort, than to call them grates.

An inspection of the model shows that the roof of Riley's air chamber may fairly be described as substantially imperforate and that it affords a resistance to air under pressure. The contention that the only restriction to the passage of air is the fuel bed itself does not seem to me sound, in view of the evidence afforded by the model, as well as that of complainant's experts. I cannot agree with the view of Mr. Browne that Riley keeps his grates cool in precisely the same way that all common grates are kept cool—by providing them with openings through which the air passes. The openings through which the air passes to Riley's fuel supports are very small in proportion to the size of ordinary grate openings and are not coextensive therewith. There are doubtless certain features of Riley's stoker which are substantially different from Daley's. The provision for removing ash from the side plates and the provision for supplying air for combustion at certain portions of the side plates seem to be improvements; but the primary question is still whether Riley has Daley's air chamber.

Certain experiments by the defendants as to the maintenance of pressure in the Riley air chamber, both when the furnace was in operation with a fuel bed and when there was no fuel bed, are relied upon by the defendants. The complainant's experts are of the opinion that these experiments, which were ex parte, are of no significance, for the reason that the pressures were so low as to create conditions which were not normal. It is obvious that the resistance of the roof of the air chamber would rapidly increase with increase of the pressure of the air supply. The experiments, to be of any significance, should cover the range of operating conditions, in order to negative the crit-

icism that the experimenter had selected merely that condition favorable to the defendants' proposition rather than tested the actual pressure under varying conditions.

Neither Dumery nor Howell shows any indication that he intended to hold air under compression for purposes of cooling the metal parts, or of preheating the air for combustion. In order to justify the argument that the Riley air supply is that of the prior art, the defendants should adopt between their retorts a true open grate structure rather than blocks that form a substantially imperforate roof for the air chamber.

If the defendants' argument is sound, and it is intended to get as much air as possible through the grates, and the only restriction to the passage of air is the fuel bed, then there can be no substantial reason why that large proportion of the top of the air chamber which is now imperforate should not be made perforate, as in ordinary grates.

After a very careful consideration of the defendants' expert testimony and brief, I am of the opinion that the defendants have appropriated the invention covered by the Daley patent, and the fact that they may have improved Daley's device is not a legal justification for infringement.

It may be said, further, that the questions in this case are of a character to permit of an honest difference of opinion between the parties as to whether the Riley structure is within the Daley patent. The case involves to some extent a question of degree, and cases depending upon differences of degree are usually cases of difficulty.

The defendants also contend that the term of Daley's patent is limited by the terms of British and French patents to Daley. The patent in suit issued March 6, 1900; the British patent was sealed May 8, 1900, and is therefore a later patent, which does not affect the term of the patent in suit. Siemens v. Sellers, 123 U. S. 276, 283, 8 Sup. Ct. 117, 31 L. Ed. 153. Daley's French patent was delivered March 3, 1900, and is a prior patent, which both sides agree expires November 14, 1914.

If, as the defendants assert, the term of the patent in suit is limited by matter not apparent upon the face of the letters patent, it seems but just that such limitation should be noted in the decree for an injunction; otherwise, a decree in ordinary form would give the complainant an injunction for the apparent rather than the true term of its patent.

The defendants have properly raised the question by pleading and proof, and at final hearing complainant did not deny that the French patent is for the same invention, but urged simply that the question does not affect the present right to an injunction and accounting. It does, however, affect the term of the injunction, and I am of the opinion that a court of equity should so limit its decree as not to give the complainant an apparent right larger than its true rights as shown by the proofs.

If necessary, the parties, upon the settlement of the decree, may be further heard upon the question of the limitation of the term of the patent in suit by the French patent.

Though the Daley patent has been before me on previous hearings, I have tried to consider this case de novo upon the testimony and arguments presented in this case. My conclusion is that the claims in suit are valid and are infringed.

A draft decree may be presented accordingly.